559 S.E.2d 365

**Roberta BARRETT, Respondent,**

v.

**CHARLESTON COUNTY SCHOOL DISTRICT, Appellant.**

No. 3430.

Court of Appeals of South Carolina.

Heard Dec. 5, 2001.

Decided Dec. 31, 2001.

Rehearing Denied Feb. 20, 2002.

Alice F. Paylor and Donald B. Clark, both of Rosen, Rosen & Hagood, of Charleston, for appellant.

Deena Smith McRackan, of Charleston, for respondent.

ANDERSON, J.

Roberta Barrett, a teacher at Laing Middle School, was terminated from her job for manifesting an evident unfitness to teach based on her dishonesty in handling the proceeds of an ice cream sales account and representations made on a Wal–Mart grant application. Barrett appealed her termination to the Charleston County School Board ("the School Board"), which voted 4–1 to terminate. Barrett appealed her termination to the Circuit Court, which reversed the School Board's determination and reinstated her to her teaching

position. The School Board appeals the Circuit Court's ruling. We reverse.

## FACTS AND PROCEDURAL HISTORY

In 1999, Barrett was terminated from her teaching position at Laing Middle School for dishonesty regarding her actions in handling an ice cream sales account and her representations on a grant application form to Wal–Mart to fund a drama club trip and related activities. Barrett appealed her termination to the Charleston County School Board, which affirmed her termination, 4–1. Barrett appealed the School Board's decision to the Circuit Court, which reversed the School Board's decision and reinstated Barrett. The Circuit Court also ordered that Barrett be compensated for executing her duties in preparing to teach in a 1999 summer program for gifted students. The School Board appeals the Circuit Court's decision.

Barrett began teaching at Laing Middle School in 1986. Her teaching roles were as the computer teacher, and then as the drama teacher. She also taught in the school's gifted student program during the summer months. During the 1993 school year, in an effort to raise money for the school for technology upgrades and other improvements, Laing Middle School, in conjunction with the Laing Parent Teacher Student Organization ("PTSO"), began a program selling ice cream to the Laing students after lunch. The ice cream was sold to the students at fifty cents a serving with an average unit cost of twenty-five cents a serving. A checking account was opened at NationsBank, which was dedicated solely to handling the ice cream proceeds and expenditures.

Since the lion's share of the profits from the ice cream account were earmarked for technology upgrades, and Barrett was the computer teacher, Barrett was involved in the operation of the ice cream program from its inception. Her initial role was limited to rolling coins, counting the money, and making deposits into the account. From 1993–1995, Norma Kulseth maintained the books and was responsible for writing the checks to pay the ice cream vendor. During the school year of 1995–1996, Jennifer Coe assumed the duties of maintaining the books and writing the checks to pay the vendor. During their respective tenures, Kulseth and Coe kept specific

records regarding the deposits made and checks written to and from the account. From 1993–1996, the ice cream account showed substantial profits and both Kulseth and Coe testified money was always available in the account to pay the ice cream vendor.

By 1996, the PTSO had spent a substantial amount of the ice cream proceeds on technology upgrades and a discussion was held about the future use of the ice cream monies. Barrett was now the drama teacher and in the summer of 1996, during a meeting between Kulseth, Barrett, and Walt Pusey, the Laing principal, Barrett assumed total control over the ice cream account. In addition to collecting and counting the money, Barrett's duties now included making the deposits, writing the checks, and accounting for the funds.

From the beginning, the technical operation of the ice cream program was a slipshod affair with no internal controls in place at any step of the operation. Pusey did not oversee the ice cream account, even though this task was within the purview of his duties as the principal. The ice cream was kept in a separate freezer dedicated solely to the ice cream sales program and was refilled by the ice cream delivery driver without anyone from the school checking the invoices to make certain that all the ice cream purchased was actually delivered. The money box used to make change by volunteers and teachers who sold the ice cream was kept in a cabinet that was unlocked during the day and was without a log-in/log-out procedure to know who had the box on a particular day. There was not even a standardized amount of change kept in the money box from day to day to determine if the person selling the ice cream on that particular day was stealing money. No records were kept of how much ice cream was sold to the children on a given day, given away, or sold at cost to the teachers. The lack of internal controls made it impossible to determine how much profit was made by the ice cream sales, or if any profit was made at all. There were also isolated incidents of spoilage and vandalism that occurred throughout the ice cream sales program that were not recorded or taken into account when determining whether or not the program was profitable.

In October 1998, Pusey informed Barrett that the PTSO wished to have a more active role in the ice cream account and

that the proceeds would now go into a PTSO account rather than the separate dedicated ice cream account. Christine Milroth took over the bookkeeping and check-writing duties while Barrett continued to collect, count, and deposit the funds. In December 1998, Milroth determined there were insufficient funds in the account to pay the outstanding ice cream bill. Milroth began investigating the account. Suspicions were raised regarding Barrett's handling of the account when the account balance fell extremely short of the expected profits during the 1997–98 school year. The method the school used to estimate profits was to take the number of units purchased from the vendor and multiply it by twenty-five cents.

Dianne Thomas, the Charleston County School District Auditor, was asked to audit the account for the years 1996–98, the period of time where Barrett had exclusive control over the account. Thomas determined the account revealed a $19,000 difference between actual money taken in and the amount of the expected profit. When Thomas reviewed the activities of the account during Barrett's tenure, she discovered Barrett had written personal checks to the account on several occasions. Barrett's very first act when coming into sole control of the account was to write a $2,000 check out of the ice cream account, emptying the account, to her mother-in-law's account, over which Barrett had the power to withdraw money. Also, Barrett did not keep detailed records about the amounts deposited into the account, nor did she record invoices, in contrast to the record keeping techniques used by Kulseth and Coe.

In an effort to determine Barrett's honesty, Milroth arranged a test situation where Barrett was given money to count and deposit into the PTSO account. Barrett was told that the money was uncounted. In actuality, the money had already been counted and the exact amount of the expected deposit was known. Barrett's actual deposit was less than the amount of money given to her to be deposited.

In 1997, Barrett wanted to take her drama club students on a field trip to New York City. Pusey denied her request for the trip to be a school-sponsored trip. In an effort to independently raise money for the trip, Barrett and her drama club students began selling candy outside of a local Wal–Mart.

Barrett was informed that Wal–Mart had a matching grant program after a store manager noticed what Barrett and her students were doing. Wal–Mart instituted the grant program to foster good will in the community and to receive a tax break. However, Wal–Mart could only obtain the tax break by giving the money to certain types of organizations, not individuals. On the grant application form, Barrett checked the box stating she was representing a school organization, which was the option closest to a drama club.

Wal–Mart awarded Barrett $1,000 based on the grant application. Barrett took the money and deposited it into her personal account rather than the school account. Barrett kept close track of the proceeds and their distribution from her personal account. Each student who went on the trip received $50 and Barrett kept receipts that showed the remaining proceeds, $500, were spent on a production given at a local nursing home. These receipts were offered to Wal–Mart. The School Board cited the handling of the grant application and the discrepancies in the ice cream account as grounds for dishonesty warranting immediate termination.

## STANDARD OF REVIEW

■ Using the proper standard of review is critical to determine the proper outcome in this case. Barrett argues the correct standard of review when evaluating a decision to terminate a teacher for evident unfitness is proof the conduct demonstrating the evident unfitness be undeniably and abundantly present. We disagree. South Carolina case law is clear and unambiguous respecting the proper standard of review regarding the propriety of a teacher's termination. It is the substantial evidence test. *See Felder v. Charleston County Sch. Dist.,* 327 S.C. 21, 489 S.E.2d 191 (1997); *Kizer v. Dorchester County Vocational Educ. Bd. of Trustees,* 287 S.C. 545, 340 S.E.2d 144 (1986); *Lexington County Sch. Dist. One Bd. of Trustees v. Bost,* 282 S.C. 32, 316 S.E.2d 677 (1984); *Laws v. Richland County Sch. Dist. No. 1,* 270 S.C. 492, 243 S.E.2d 192 (1978); *Barr v. Board of Trustees of Clarendon County Sch. Dist. No. 2,* 319 S.C. 522, 462 S.E.2d 316 (Ct.App. 1995); *Hendrickson v. Spartanburg County Sch. Dist. No. Five,* 307 S.C. 108, 413 S.E.2d 871 (Ct.App.1992); *Hilliard v. Orangeburg County Sch. Dist. No. Three,* 300 S.C. 123, 386 S.E.2d 628 (Ct.App.1989).

Barrett cites *Kizer v. Dorchester County Vocational Education Board of Trustees*, 287 S.C. 545, 340 S.E.2d 144 (1986) and *Hall v. Board of Trustees of Sumter County School District Number 2*, 330 S.C. 402, 499 S.E.2d 216 (Ct.App. 1998), as authority to state that proof of conduct must be undeniably and abundantly present. Barrett misapprehends these cases. In *Kizer*, the Supreme Court was merely typifying the evidence as undeniably and abundantly present, not articulating a new standard: "Therefore, the officially enunciated public policy of this State is to provide for immediate removal of those whose conduct manifests evident unfitness. Such conduct is undeniably and abundantly present in this case." *Id.* at 550, 340 S.E.2d at 147. Earlier in the *Kizer* opinion, however, the Court stated that the substantial evidence test was the proper test. *Id.* at 548, 340 S.E.2d at 146. Although the *Hall* case references the "undeniably and abundantly present" language in *Kizer*, a reading of the entire *Hall* opinion makes clear that the court is not declaring a new standard of review but is applying the substantial evidence test.

Therefore, this Court is limited to examining the record to determine whether substantial evidence existed to support the School Board's decision to terminate Barrett for dishonesty in her dealings with the ice cream account and the Wal–Mart grant application. "The court cannot substitute its judgment for that of the school board." *Felder*, 327 S.C. at 25, 489 S.E.2d at 193 (citation omitted). " 'Substantial evidence' is not a mere scintilla of evidence nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion that the Board reached or must have reached in order to justify its action." *Laws*, 270 S.C. at 495–96, 243 S.E.2d at 193 (citation omitted).

## *LAW/ANALYSIS*

Barrett is a contract teacher. As such, the rules regarding her termination fall under the South Carolina Teacher Employment and Dismissal Act, S.C.Code Ann. §§ 59–25–410 to 530. It is undisputed that the School Board immediately terminated Barrett's employment without provid-

ing for a remedial corrective period. The statute provides for certain situations where a School Board can immediately terminate a teacher:

> Any teacher may be dismissed at any time who ... manifest[s] an evident unfitness for teaching.... Evident unfitness for teaching is manifested by conduct such as, but not limited to, the following: persistent neglect of duty, willful violation of rules and regulations of district board of trustees, drunkenness, conviction of a violation of the law of this State or the United States, gross immorality, dishonesty, illegal use, sale or possession of drugs or narcotics.

S.C.Code Ann. § 59–25–430 (1990).

## I. Ice Cream Account

There is substantial evidence in the record to support the School Board's finding that Barrett was dishonest in her dealings with the ice cream account.

### A. The $2,000 Check

One of Barrett's first actions when she took over exclusive control of the ice cream account was to empty the account by writing a $2,000 check to her mother-in-law's personal checking account. Barrett had signatory power to withdraw money from her mother-in-law's account. When asked about her reason for writing the check to her mother-in-law's account, Barrett responded that it was to reimburse her mother-in-law for paying invoices that were due to the ice cream vendor. However, Barrett testified that she never called her mother-in-law's bank to verify whether her mother-in-law had actually paid the money to cover the ice cream account before writing her the $2,000 check. There was also evidence in the record stating that the amount actually owed the ice cream vendor for the period of time the $2,000 check covered was only $1,100.

### B. Barrett's Personal Checks Written to the Ice Cream Account

During Barrett's tenure of exclusive control over the ice cream account, a pattern emerged where she would periodically write checks from her personal account to the ice cream account. It is noteworthy that Kulseth and Coe did not write checks from their personal accounts to the ice cream account

when they controlled the ice cream account. Testimony revealed Barrett wrote these personal checks to the ice cream account at times when funds were needed to cover checks written to the ice cream vendor, and always for an amount just enough to cover the amount due the vendor. This fact coincided with Barrett's practice of taking the proceeds from the ice cream sales home and not making deposits for weeks at a time. Barrett's stated reason for writing personal checks to the ice cream account was to reimburse the account for rolled coins she gave her daughter for her daughter's coin collection.

Although we are only concerned with the existence of evidence and not its weight, it strains the limits of credulity to think that Barrett gave her child $1,300 in coins over a two year period. Substantial evidence exists in the record to support the School Board's belief that Barrett was taking the money home and only putting enough money in to pay the bills, thus ensuring the ice cream account would break even while enabling her to keep any excess for herself.

### C. Short Deposits

Even after Barrett relinquished exclusive control of the ice cream account, she remained involved by counting money and making deposits into the account. When examinations and audits of the ice cream account revealed suspicions about Barrett's handling of the account, Milroth and Cindy Hamlin, the PTSO bookkeeper, designed a scenario to test Barrett's honesty. They gave Barrett money from the ice cream proceeds and told her it had not been counted. They then instructed Barrett to count the money and call the amount in to Milroth. In fact, the money had already been counted and the amount that Barrett should have submitted to Milroth was known. This method was used to test Barrett's veracity on two separate occasions. The first time, Barrett submitted a figure that was $30 less than the counted amount. The second time, Barrett reported an amount that was $14 less.

Just after Milroth took over the ice cream account and determined that there were insufficient funds to cover the pending ice cream bill, she took a comprehensive inventory and kept meticulous records about what had been sold to the children during the period. By doing this, Milroth knew exactly how much money should have been collected during

this period. She called Barrett to find out how much money had been collected during this time. Barrett responded that the amount was $300. When Milroth stated the amount should be $460, Barrett increased her figure to $350 stating she had not counted all the coins. Five days later, Barrett actually deposited only $185 into the account, an amount just enough to cover the pending ice cream invoice. The evidence of the short deposits is the most damaging evidence to Barrett's position that substantial evidence did not exist to support the School Board's finding because these are specific instances where records were kept to determine exactly how much money should have been deposited and every time, the amounts actually deposited were significantly less.

### D. Shoddy Recordkeeping

While cross-examining Barrett, the School Board's counsel asked Barrett questions regarding what records she kept of the account. Barrett admitted she did not keep a ledger, did not reconcile the bank statements, and did not keep specific track of the amount of money in the account. She did admit to maintaining a check register; however, she never recorded any of the personal checks she wrote as deposits to the ice cream account. Barrett testified that she was just following the procedures of her predecessors who handled the account. However, the testimony of Kulseth and Coe showed they both kept more complete records regarding the ice cream account than Barrett did.

Barrett also stated a reason for her method of keeping records for the account was she was not a good record keeper. The School Board could doubt this testimony in light of her handling the funds from the Wal–Mart grant that were deposited in her own personal account. When Barrett received the grant from Wal–Mart, she gave every student who went on the field trip $50 and spent the remaining $500 on the production costs for a play given at a nursing home. In contrast of her handling of the ice cream account, she kept and noted every receipt of the expenditures made from the grant. Her handling of the grant money is substantial evidence that Barrett could keep adequate financial records when it suited her to do so. The contrast in her handling of the grant money in combination with her lack of keeping adequate records of the ice cream account, especially her failure to

436

record her personal checks made to the ice cream account as deposits, is substantial evidence supporting the School Board's finding that Barrett was seeking to conceal her activities regarding the ice cream account.

## II.  Wal–Mart Grant Application

Considering our decision that substantial evidence existed in the record to support the School Board's decision to terminate Barrett for dishonesty from her dealings with the ice cream account, we do not need to reach whether substantial evidence existed to show Barrett was dishonest in her representations on the Wal–Mart application.

### *CONCLUSION*

Applying the substantial evidence test, we hold that substantial evidence existed in the record to support the School Board's decision to terminate Barrett because she manifested an evident unfitness for teaching based on her dishonesty in dealing with the ice cream account.  Accordingly, we reverse the Circuit Court's decision to reinstate and reimburse Barrett.

**REVERSED.**

CONNOR and HUFF, JJ., concur.